```
                                    )
FRIENDS OF BLACKWATER, et al.,      )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )    Civ. Action No. 09-2122 (EGS)
                                    )
KENNETH SALAZAR, et al.,            )
                                    )
          Defendants.               )
                                    )
```

## MEMORANDUM OPINION

In 1985, the Virginia Northern Flying Squirrel, *Glaucomys sabrinus fuscus*, (the "Squirrel") was listed as an endangered species under the Endangered Species Act ("ESA") by the U.S. Fish and Wildlife Service ("FWS"). Over two decades later, in 2008, the FWS delisted the Squirrel pursuant to the Final Rule Removing the Virginia Northern Flying Squirrel From the Federal List of Endangered and Threatened Wildlife ("Delisting Rule"), 73 Fed. Reg. 50,226 (Aug. 26, 2008). Plaintiffs brought this suit challenging the delisting.[1]

---

[1] There are six plaintiffs, including five non-profit organizations and one individual. Defendants are Kenneth Salazar, the Secretary of the U.S. Department of the Interior ("Secretary"), and Rowan Gould, Acting Director of the U.S. Fish and Wildlife Service. (Pursuant to Fed. R. Civ. P. 25(d), Mr. Gould has been automatically substituted as a defendant for his predecessor, Sam D. Hamilton, who was sued in his official capacity.)

Pending before the Court are plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment. Upon consideration of the motions, the responses and replies thereto, the applicable law, the administrative record, the arguments by counsel at the November 17, 2010 motions hearing, and for the reasons set forth below, plaintiffs' motion for summary judgment is hereby **GRANTED**, and defendants' cross-motion for summary judgment is hereby **DENIED**. The Court concludes that the agency violated Section 4(f) of the ESA, 16 U.S.C. § 1533(f), when it effectively revised its recovery plan for the Squirrel without employing notice-and-comment rulemaking. Accordingly, the Court hereby **VACATES** the Delisting Rule and **REMANDS** to the agency for further proceedings consistent with this Opinion.

**I.    BACKGROUND**

    **A.    The Endangered Species Act**

By 1973 when the Endangered Species Act was enacted, Congress had concluded that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation[.]"  16 U.S.C. § 1531(a)(1). In addition, Congress found that "other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction," and "these

2

species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people[.]" *Id.* § 1531(a). The ESA was therefore enacted in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species[.]" *Id.* § 1531(b).[2]

On his own initiative or in response to the petition of an "interested person," the Secretary of the Interior determines whether a species is an endangered species or a threatened species[3] based on the evaluation of five factors, "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease

_____

[2] The ESA states that "'conserve,' 'conserving,' and 'conservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

[3] The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range[.]" 16 U.S.C. § 1532(6). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Secretary is required to maintain and publish lists in the Federal Register of all species which have been determined to be endangered or threatened. *Id.* § 1533(c)(1).

or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1). The Secretary is required to make this determination "solely on the basis of the best scientific and commercial data available[.]" *Id.* § 1533(b)(1).

Once a species is designated an endangered or threatened species, certain legal protections are triggered. Among other things, the ESA directs the Secretary to develop and implement "[recovery] plans . . . for the conservation and survival of endangered species and threatened species . . . unless he finds that such a plan will not promote the conservation of the species." *Id.* § 1533(f)(1). Prior to the final approval of a new or revised recovery plan, the Secretary is required to "provide public notice and an opportunity for public review and comment on such plan." *Id.* § 1533(f)(4). Furthermore, each recovery plan "shall, to the maximum extent practicable, . . . incorporate in each plan -- (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species; (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and (iii) estimates of the time required and the cost to carry out

those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal." *Id.* § 1533(f)(1)(B).

At least once every five years, the Secretary must conduct a review of all listed species to determine whether any species should be delisted, or whether the status of any species should be changed from threatened to endangered or vice versa. *See id.* § 1533(c)(2). A determination to delist or change the status of an endangered or threatened species is made on the basis of the same five factors in § 1533(a)(1) that govern the initial listing of a species. *See id.* § 1533(c)(2); 50 C.F.R. § 424.11(d).

### B. Factual Background

#### i. The Virginia Northern Flying Squirrel and Its Listing as an Endangered Species

At stake in the instant action is a subspecies of the northern flying squirrel: the Virginia Northern Flying Squirrel, also known as the West Virginia Northern Flying Squirrel (*Glaucomys sabrinus fuscus*) (the "Squirrel").[4] The Squirrel is a "small, nocturnal, gliding mammal" with "distinctive patagia

---

[4] Two species of flying squirrel exist in North America, the southern flying squirrel (*Glaucomys volans*) and the northern flying squirrel (*Glaucomys sabrinus*). 50 Fed. Reg. 26,999. The northern flying squirrel is found mainly in Canada, Alaska, and the western and northern parts of the conterminous United States. However, certain subspecies of the northern flying squirrel, including the one at issue in the instant case, exist in the Appalachian Mountains of North Carolina, Tennessee, Virginia and West Virginia. *Id.*

(folds of skin between the wrists and ankles) . . . supported by slender cartilages extending from the wrist bones; these plus the broad tail create a large gliding surface area and are the structural basis for the squirrel's characteristic gliding locomotion.  Adults are dorsally gray with a brownish, tan, or reddish wash, and grayish white or buffy white ventrally." AR at 15075 (internal citations omitted).[5]

The historic range of the Squirrel is believed to correspond roughly to the distribution of old-growth red spruce and northern hardwood forests that existed prior to the extensive logging and accompanying fires that occurred at the turn of the 20th century in the Allegheny Highlands, a section of the Appalachian Mountains extending into West Virginia and Virginia.  This historic range encompassed an estimated 500,000 to 600,000 acres of old-growth red spruce forests.   AR at 172.

In 1985, the FWS determined that the Virginia Northern Flying Squirrel and the Carolina Northern Flying Squirrel[6] were endangered subspecies within the meaning of the ESA. Determination of Endangered Status for Two Kinds of Northern Flying Squirrel ("1985 Listing Rule"), 50 Fed. Reg. 26,999.  In

---

[5] Citations to the Administrative Record are abbreviated "AR".

[6] Although the Carolina Northern Flying Squirrel was listed as endangered simultaneously with the Virginia Northern Flying Squirrel, only the Virginia Northern Flying Squirrel has been delisted and accordingly is the subject of this litigation.

particular, the 1985 Listing Rule stated that "[a]vailable evidence indicates that [the two subspecies] are rare and that their historical decline is continuing." *Id.* Efforts to capture and identify individual squirrels, for the purpose of evaluating the population, had resulted in the capture of very few squirrels. *Id.* Considering the first of the five factors outlined by the ESA under § 1533(a)(1), the FWS explained in the 1985 Listing Rule that:

> [The two subspecies] now have a relictual distribution, restricted to isolated areas at high elevations, separated by vast stretches of unsuitable habitat. In these last occupied zones, the squirrels and their habitat may be coming under increasing pressure from human disturbance, such as logging and development of skiing and other recreational facilities.

50 Fed. Reg. 26,999, 27,000.[7]

### ii. The Recovery Plan

In 1990, in accordance with the requirements of § 1533(f), the FWS issued an Appalachian Northern Flying Squirrels Recovery Plan ("Recovery Plan"). Ultimately, the objective of the

---

[7] The agency also concluded that the northern flying squirrel (including the subspecies at issue in the present litigation) was losing ground to the southern flying squirrel. In particular, the agency pointed out that "logging and other clearing activity has not only reduced the original habitat of the northern flying squirrel, but resulted in an invasion of this zone by the southern flying squirrel. . . . Regrowth in the cleared areas, if any, tended to be deciduous forest favored by [the southern flying squirrel], and hence the way was open for the spread of that species." 50 Fed. Reg. 26,999, 27,000.

Recovery Plan was to set forth a plan that, if accomplished, would "remove [the Squirrel] from the list of endangered and threatened species." AR at 15092. The agency envisioned that this would occur in two stages. The Squirrel would first be "downlisted" from endangered status to threatened status and then later delisted altogether. AR at 15092. Accordingly, the agency first outlined three criteria necessary for downlisting the species from endangered to threatened status, stating that:

> Downlisting from endangered to threatened status will be possible when it can be documented that: [1] squirrel populations are stable or expanding (based on biennial sampling over a 10-year period) in a minimum of 80% of all Geographic Recovery Areas designated for the subspecies, [2] sufficient ecological data and timber management data have been accumulated to assure future protection and management, and [3] [Geographic Recovery Areas] are managed in perpetuity to ensure: (a) sufficient habitat for population maintenance/expansion and (b) habitat corridors, where appropriate elevations exist, to permit migration among [Geographic Recovery Areas].

AR at 15092.[8]

In addition to the three factors necessary for downlisting, the agency identified a fourth factor that would need to be met to warrant delisting the Squirrel completely. Specifically, the agency stated in the Recovery Plan that:

_____

[8] The Recovery Plan identified five Geographic Recovery Areas ("GRAs") that corresponded with the known distribution of the Squirrel at the time. The GRAs encompassed terrain in 10 counties in West Virginia and one county in Virginia. AR at 15090.

De-listing will be possible when, in addition to the
above factors, it can be demonstrated that . . . the
existence of the high elevation forests on which the
squirrels depend is not itself threatened by
introduced pests, such as the balsam wooly adelgid or
by environmental pollutants, such as acid
precipitation or toxic substance contamination.

AR at 15092.

Accompanying the criteria necessary for downlisting and

ultimately delisting the species, the Recovery Plan also

contained a detailed narrative describing numerous recovery

tasks identified by the agency.[9]  A detailed implementation

schedule was also included in the Recovery Plan, as well as

guidelines for the identification and management of the

Squirrels' habitat.  AR at 15112-15118.[10]

---

[9] The scope of these tasks was quite ambitious.  Tasks included,
among others, establishing a recovery advisory committee,
determining the Squirrels' distribution, identifying and
surveying potential habitats, monitoring known populations,
conducting in-depth studies of the Squirrels' habitat
requirements, studying the relationship among population size,
habitat size and habitat quality, studying the effects of timber
harvest and other developments on Squirrels' habitat, studying
the diet of the species, investigating the potential
accumulation of toxins – particularly pesticides and heavy
metals – in the Squirrels' food supply, studying the interaction
of the endangered species with other species of squirrels,
determining the genetic variability within the species,
developing guidelines for private landowners and other
individuals, implementing protection procedures and policies,
and implementing educational programs.  AR at 15093-15105.

[10] In 2001, the FWS issued a relatively brief Appalachian
Northern Flying Squirrels Recovery Plan Update ("Recovery Plan
Update").  The primary purpose of the Recovery Plan Update was
to amend the habitat identification guidelines that were
contained in Appendix A of the original Recovery Plan.  In

### iii. The 5-Year Review

The five-year review of the Squirrel began in 2003, despite the ESA's requirement that "[t]he Secretary shall . . . conduct, at least once every five years, a review of all species [listed as endangered or threatened] and . . . determine on the basis of such review whether any such species should (i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species."  16 U.S.C. § 1533(c)(2).  Early drafts of the report did *not* recommend delisting the Squirrel.[11]  However, after internal editing, the

---

particular, the agency noted that it may have placed too much emphasis on the use of live trapping and/or the placement and monitoring of manmade nest boxes to determine the presence of the Squirrel in a particular area.  AR at 15212.  The FWS stated that it now believed that the Squirrel was "less likely to use nest boxes or enter traps in good quality habitat due to the natural presence of numerous den sites and an abundance of preferred foods."  AR at 15212.  Based on the additional information obtained since the 1990 Recovery Plan, the FWS concluded that "[r]ecovery of [the Squirrel] must go beyond protecting only those areas where the squirrel can be located through trapping and nest box placement and monitoring."  AR at 15212.  The amendments made no changes to any of the criteria contained in the 1990 Recovery Plan relating to downlisting or delisting the Squirrel.

[11] For example, in a 2003 draft of the report, it states that "[a] change in classification is not warranted at this time. Additional information on population trends and ecosystem health would allow a more thorough and reliable review of the subspecies' status."  AR at 6132.   The same 2003 draft states that "habitat loss has continued since listing on public and private lands," and that "[h]abitat loss, alteration, and fragmentation . . . are still primary threats to the [Squirrel].

final version of the five-year review document, the West Virginia Northern Flying Squirrel 5-Year Review: Summary and Evaluation (the "5-Year Review Summary"), altered course and recommended that the Squirrel be delisted in April of 2006.

Significantly, in the final version, the FWS decided not to evaluate the status of the Squirrel based on the parameters of the agency's 1990 Recovery Plan. In so doing, the FWS explained that, "[a]lthough the recovery criteria as they apply to [the Squirrel] were deemed objective, measurable, and adequate when the plan was approved in 1990 and updated in 2001, they do not meet current standards for adequacy. . . . [T]he plan is not actively used to guide recovery for two reasons: first, it was developed over 15 years ago and needs updating, and, second, its recovery criteria and actions are, for the most part, combined and generalized for both [the Carolina Northern Flying Squirrel] and [the Virginia Northern Flying Squirrel]." AR at 166. Instead of applying the criteria set forth in the Recovery Plan, the FWS conducted an analysis based on the five listing factors contained in § 1533(a)(1) of the ESA.[12]

---

Acid deposition (industrial discharge), mineral extraction, private land development, highway construction, and exotic pests – instead of logging – are the leading sources of these stresses." AR at 006125; AR at 6129.

[12] With respect to § 1533(a)(1)(A) ("Factor A"), the agency concluded that the habitat occupied by the Squirrel was much more extensive than previously understood, and the Squirrel was

In light of the results of its 5-Year Review Summary, the
agency concluded that "the species is persisting throughout its
historic range . . . . Habitat loss is localized, and a
substantial amount of habitat is now considered secure and
improving in quality.  Therefore . . . it is evident that [the
Squirrel] does not meet the definition of endangered or

---

"more resilient in its habitat use than formerly thought[.]"  AR
at 173.  FWS explained that the conclusions in 1985 were based
on an underestimation of the ability of the Squirrel to utilize
ecosystems other than the red spruce and spruce-hardwood
ecosystem.  AR at 181.  With respect to § 1533(a)(1)(B) ("Factor
B"), the agency noted that, contrary to its findings in 1985,
"in the 21 years since listing the Service has not received any
evidence that overutilization is a threat" and that "there is no
evidence of commercial use in the pet trade or of recreational
use of [the Squirrel]."  AR at 176.  Similarly, in the 5-Year
Review Summary, the agency found no threats based on "disease
and predation" under § 1533(a)(1)(C) ("Factor C").  Regarding
§ 1533(a)(1)(D)("Factor D"), requiring the agency to consider
"the inadequacy of existing regulatory mechanisms," the agency
came to the conclusion that "[o]verall, existing regulatory
mechanisms in conjunction with continuing forest management
provisions and landowner agreements make it highly likely that
[the Squirrel] will be protected and managed for the long term
across most of its range, irrespective of the subspecies'
listing status under the federal ESA."  AR at 178.  Finally,
regarding § 1533(a)(1)(E) ("Factor E"), addressing the "other
natural or manmade factors" affecting a species, the FWS
concluded that no serious threat to the Squirrel could be
identified.  Addressing the concern from 1985 that a parasite
carried by the southern flying squirrel threatened the northern
flying squirrels, the agency determined that the evidence had
not been accurately interpreted and further concluded that
"observations of [the Squirrel] capture[d] in the last 20 years
. . . have shown no signs of sickness, debilitation, or death
due to parasite infection."  AR at 178.  The agency also
analyzed a handful of potential threats that had arisen since
the 1985 listing, including two forest pests (the hemlock woolly
adelgid and the balsam woolly adelgid), beech bark disease, acid
precipitation, and climate change.  AR at 179-180.

threatened." AR at 182. The agency indicated that it would

initiate the process to delist the species.

### iv. Delisting of the Squirrel

After the requisite notice and comment period, the FWS

promulgated the Delisting Rule on August 26, 2008. 73 Fed. Reg.

50,226. The Delisting Rule largely reflects the conclusions

drawn in the 5-Year Review Summary issued in 2006. In

particular, the decision to delist the Squirrel in 2008 appears

to have been prompted principally by a conclusion that the

Squirrel was not as rare as was previously believed. As the

agency explained in the Delisting Rule:

> At the time of listing, the [Squirrel] was thought to
> be an extremely rare and declining taxon that had
> disappeared from most of its historical range. We now
> know that occupancy of available habitat has increased
> and is much more widespread and well connected than
> formerly thought, and the geographic extent of the
> [Squirrel's] range approximates historical range
> boundaries . . . . Additionally, we have learned that
> the [Squirrel] has adapted to changes in the spruce
> ecosystem over the past hundred years, and can
> successfully exploit the existing habitat conditions
> throughout the landscape.

AR at 20.

As the agency had done in the 5-Year Review, it assessed

the species based upon the five factors contained in

§ 1533(a)(1) and did not apply all of the criteria in the

Recovery Plan. (In its analysis of the five factors, the agency

reached substantially the same conclusions as the 5-Year Review

13

Summary.)  In so doing, the agency explained in the Delisting

Rule its position that "[r]ecovery plans are not regulatory

documents and are instead intended to provide guidance to the

Service, States, and other partners on methods of minimizing

threats to listed species and on criteria that may be used to

determine when recovery is achieved."  AR at 1.  The agency went

on to further explain that:

> There are many paths to accomplishing recovery of a
> species, and recovery may be achieved without all
> criteria being fully met. For example, one or more
> criteria may have been exceeded while other criteria
> may not have been accomplished. . . . In other cases,
> recovery opportunities may have been recognized that
> were not known at the time the recovery plan was
> finalized.  These opportunities may be used instead of
> methods identified in the recovery plan.  Likewise,
> information on the species may be learned that was not
> known at the time the recovery plan was finalized.
> This new information may change the extent to which
> criteria need to be met for recognizing recovery of
> the species.  Overall, recovery of species is a
> dynamic process requiring adaptive management, and
> judging the degree of recovery of a species is also an
> adaptive management process that may, or may not,
> fully follow the guidance provided in a recovery plan.

AR at 1-2.

Using this approach to recovery plans, the agency then

determined that "[n]ew information on the [Squirrel] has been

learned that was not known at the time the recovery plan and the

amendment were finalized. . . . This new information changes the

extent to which two of the four Recovery Plan criteria need to

be met for recognizing recovery of the subspecies."  AR at 2.

The two criteria affected were the first and the third criteria of the Recovery Plan, relating to the Squirrel population and the management of the GRAs, respectively.

As noted above, the first criterion set out in the Recovery Plan required that downlisting or delisting would be possible "when it can be documented that: . . . squirrel populations are stable or expanding (based on biennial sampling over a 10-year period) in a minimum of 80% of all Geographic Recovery Areas designated for the subspecies." AR at 15092. Nonetheless, the agency did not rely upon population trend data when delisting the species, as was contemplated by the first criterion in the Recovery Plan. Instead, the agency relied upon evidence of "persistence" of the species. AR at 2, 14. The agency defined persistence as "continuing captures of [the Squirrel] over multiple generations at previously documented sites throughout the historical range." AR at 2.[13]

Using the persistence data, the agency concluded that the *intent* of the first criterion, namely a "robust" population, had been met. As the agency explained in an analysis appended to the Delisting Rule:

_____

[13] The agency further explained that, "[b]ecause [the Squirrel] first reproduces at 1-2 years, and has a relatively short life span, averaging approximately 3 years, persistence at a single monitoring site over 5 years indicates successful reproduction across multiple (three to five) generations." AR at 2.

The intent of [the first] criterion was to document
that populations are robust; i.e., stable or expanding
trends across most of the core areas of [the Squirrel]
distribution.  Based upon use of the best available
scientific data, we conclude that the intent of this
criterion has been met, considering that there has
been no extirpation documented at any site in over 20
years of monitoring (13-20 generations), and existing
populations appear to be stable (persisting for
multiple generations) across all seven core areas of
[the Squirrel] distribution.  In addition, the
[Squirrel] is much more widespread than the five GRAs
originally designated in the recovery plan.  The
number and size of the GRAs has increased, and the
current range of the [Squirrel] approximates 85% of
its historic range.

Analysis of Recovery Plan Criteria for the West Virginia

Northern Flying Squirrel, AR at 39.

Similarly, the agency asserted that the "intent" had been

met with respect to the third criterion of the Recovery Plan,

which provided that downlisting or delisting would be possible

when it could be documented that the five GRAs identified in the

Recovery Plan "are managed in perpetuity."  AR at 15092.  The

agency concluded that the intent of this criterion had been met

because "79% of the [Squirrel] habitat (189,785 acres) is likely

to remain protected from logging and other disturbances for the

foreseeable future," and "[a]ll of the five original GRAs in the

recovery plan are predominantly in public ownership[.]"  AR at

46.

Plaintiffs initiated this lawsuit challenging, among other

things, the agency's conclusion that it need not do more than

meet the "intent" of the criteria laid out in the Recovery Plan. Plaintiffs' motion for summary judgment and defendants' cross motion are now ripe for consideration by the Court.

## II.  STANDARD OF REVIEW

"Since the ESA does not specify a standard of review, judicial review is governed by Section 706 of the Administrative Procedure Act." *Gerber v. Norton*, 294 F.3d 173, 178 n.4 (D.C. Cir. 2002) (quoting *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982)).  The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides a right to judicial review of final agency actions.  Under the APA, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  To make this finding, the court must determine whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 432 (D.C. Cir. 2009) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

Where a court is reviewing an agency's interpretation of a statute that the agency is charged with administering, the appropriate standard of review is the framework set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467

U.S. 837 (1984).  In particular, "[u]nder step one of *Chevron*,

[the court] ask[s] whether Congress has directly spoken to the

precise question at issue, in which case [the court] must give

effect to the unambiguously expressed intent of Congress." *Sec'y*

*of Labor, Mine Safety & Health Admin. v. Nat'l Cement Co. of*

*California, Inc.*, 494 F.3d 1066, 1073 (D.C. Cir. 2007)(internal

quotations omitted).  If the court concludes that the "'statute

is silent or ambiguous with respect to the specific issue'. . .

[the court] move[s] to the second step and defer[s] to the

agency's interpretation as long as it is 'based on a permissible

construction of the statute.'" *Nat'l Cement Co., Inc.*, 494 F.3d

at 1074 (quoting *Chevron*, 467 U.S. at 843).

## III. ANALYSIS

Plaintiffs' principal argument in this lawsuit is that

Section 4(f) of the ESA, which covers the use of recovery plans

by the agency, imposes obligations on the FWS that were not

fulfilled in connection with the delisting of the Squirrel.  In

particular, plaintiffs argue that "when FWS establishes recovery

criteria for a species or subspecies in a formal recovery plan,

the agency is required to abide by those criteria in making

status determinations unless it amends the recovery plan in the

manner ordained by the ESA."  Pls.' Mem. at 25.

In response to plaintiffs' position, defendants argue that

because the ESA "is clear on its face that the [agency's]

18

delisting analysis is based on the threats found under the five factors provided by [16 U.S.C. §1533(a)]," the decision to delist a species is not "governed by . . . the 'objective, measurable criteria' specified in a recovery plan." Defs.' Reply at 6-7. Defendants argue that the purpose of recovery plans is merely to "establish guidance and direction that can be meaningfully utilized and implemented to recover a species." Defs.' Mem. at 35; *see also* AR at 1 ("Recovery plans are not regulatory documents and are instead intended to provide guidance . . . on methods of minimizing threats to listed species and on criteria that may be used to determine when recovery is achieved. There are many paths to accomplishing recovery of a species, and recovery may be achieved without all criteria being fully met.").[14]

Defendants' arguments and the position taken by the agency in the Delisting Rule raise two questions for the Court. The first issue is whether the agency's decision to set aside two of

---

[14] Defendants also argue that "Congress did not impose a mandate to the [agency] to 'revise' recovery plans based on new or emerging information, belying Plaintiffs' claims that the [agency] must revise a recovery plan prior to conducting an inquiry under [16 U.S.C. § 1533(a)]." Defs.' Mem. at 34; *see also* Defs.' Reply at 7 ("the ESA imposes no obligation to continually update or revise a recovery plan.") However, as is discussed below, the Court finds that the agency did in fact revise the Recovery Plan for the Squirrel when it essentially abandoned two of the four criteria contained in its own Recovery Plan. Accordingly, whether or not the ESA *requires* the agency to revise a recovery plan under certain circumstances is not determinative.

the four criteria in its Recovery Plan constituted a revision to
the Recovery Plan.  The second question is whether the agency's
position that it met the "intent" of the Recovery Plan criteria
satisfies the requirements of the ESA.  Each of these topics is
discussed in turn.

**A.   The Agency's Decision to Set Aside the Criteria
Contained in the Recovery Plan**

Defendants' arguments rely on the position that recovery
plans merely provide guidance, which may be set aside without
such an action constituting a revision to the Recovery Plan,
because the ESA only requires the agency to consider the five
factors of § 1553(a)(1), using the best available science, when
delisting a species.  Defs.' Mem. at 36; Defs.' Reply at 9
("[W]hile the criteria [of a recovery plan] help to *inform* a
delising analysis, the criteria do not *control* a delisting
analysis.").

There are two flaws in the approach taken by the agency and
the defendants' arguments in this litigation.  First, the
statutory language of the ESA makes it clear that the obligation
to "develop *and implement*" recovery plans and to include
objective and measurable criteria in those recovery plans are
mandatory aspects of the ESA.  As noted above, the ESA mandates
that "[t]he Secretary *shall* develop and implement [recovery]
plans . . . for the conservation and survival of endangered

species and threatened species[.]"  16 U.S.C. § 1533(f)(1)

(emphasis added).[15]  Recovery plans fulfill one of the purposes

of the ESA that the FSW "do far more than merely avoid the

elimination of protected species. It must bring these species

back from the brink so that they may be removed from the

protected class, and it must use all methods necessary to do

so."  *Defenders of Wildlife v. Andrus,* 428 F. Supp. 167, 170

(D.D.C. 1977).

Furthermore, Congress did not stop with a simple

requirement to develop and implement a recovery plan.  The ESA

requires that each recovery plan shall, among other things, "to

the maximum extent practicable . . . incorporate in each

plan . . . objective, measurable criteria which, when met, would

result in a determination, in accordance with the provisions of

this section, that the species be removed from the list[.]"  16

U.S.C. § 1533(f)(1)(B).[16]  In the event the agency finds it

necessary to revise a recovery plan, Congress expressly provides

a vehicle for doing so: the statute states that "[t]he Secretary

_____

[15] The statute does provide an exception.  A recovery plan is not
required if the Secretary "finds that such a plan will not
promote the conservation of the species."  16 U.S.C.
§ 1533(f)(1).  However, defendants have not taken the position
that a recovery plan would not have "promoted the conservation"
of the Squirrel, and, in any event, the agency did indeed create
a recovery plan for the Squirrel.  The exception therefore
appears inapplicable in the instant case.

[16] In the instant case, four objective, measurable criteria were
clearly laid out on page 18 of the Recovery Plan.  AR at 15092.

shall, prior to final approval of a new *or revised recovery plan*, provide public notice and an opportunity for public review and comment on such plan." 16 U.S.C. § 1533(f)(4)(emphasis added).

The legislative history reinforces the unambiguous meaning of the statute. In conjunction with the 1988 amendment to the ESA, which added the "objective, measurable criteria" requirement, Congress explained that:

> Section 4(f) of the Act is amended to require that each recovery plan incorporate descriptions of site-specific management actions to achieve recovery, criteria by which to judge success of the plan, and time frames and estimates of costs to carry out the planned recovery. . . . These descriptions, criteria, and estimates currently are not provided uniformly in recovery plans. Incorporation of this information will ensure that plans are as explicit as possible in describing the steps to be taken in the recovery of a species. . . . The requirement that plans contain objective, measurable criteria for removal of a species from the Act's lists and timeframes and cost estimates for intermediate steps toward that goal will provide a means by which to judge the progress being made toward recovery.

S. Rep. No. 240, 100th Cong., 2d. Sess. 111-32 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2700, 2708-2709.

In light of the above statutory language and accompanying legislative history, the Court concludes that the agency's decision to set aside two of the criteria in its Recovery Plan constituted a revision to the Recovery Plan within the meaning

of the ESA.  Accordingly, the agency was required to employ notice-and-comment rulemaking.

The second flaw in defendants' position is that it would render an explicit provision of the ESA meaningless, violating the "cardinal principle of statutory construction" that Courts shall "give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section." *Bennett v. Spear*, 520 U.S. 154, 173 (1997)(internal quotations omitted).  Defendants have taken the position that because § 1533(a)(1), containing the five factors discussed above, fails to mention recovery plans, Congress intended these factors to be the only restrictions on the agency's ability to delist a species.  However, § 1533(f) must be understood as imposing separate, distinct obligations on the agency.  Merely because § 1533(a) imposes one set of requirements on the agency does not mean that § 1533(f), imposing separate obligations on the agency, may be disregarded.  Permitting the FWS to set aside two of the four criteria in its own Recovery Plan while taking the position that such an action was not a revision to the Recovery Plan, would render the provision requiring the agency to subject its revisions to public notice and comment meaningless.

Even assuming that defendants correctly assert that the Recovery Plan for the Squirrel was outdated and contained "criteria [that] did not relate directly to threats to the

Squirrel under the five factors that formed the basis of the listing decision," Defs.' Mem. at 6, such a conclusion merely supports a revision of the Recovery Plan.  Congress clearly contemplated that revisions to recovery plans might become necessary, and the Secretary is plainly required to employ notice-and-comment rulemaking and "consider all information presented during the public comment period prior to approval of the plan."  16 U.S.C. § 1533(f)(4).  Similarly, defendants' argument that "should the provisions of a recovery plan no longer constitute the best available scientific data, the [agency] cannot ignore recent and credible scientific data simply to defer to the contents of a recovery plan,"  Defs.' Mem. at 31-32, again does not explain the agency's failure to comply with the procedures laid out in § 1533(f)(4) for the revision of recovery plans.

Defendants also point to the ESA's directive that the agency "shall, to the maximum extent practicable . . . incorporate in each plan . . . objective, measurable criteria which, when met, *would* result in a determination . . . that the species be removed from the list[.]"  16 U.S.C. § 1533(f)(1).  Defendants focus on the use of the word "would" in support of their argument that "the text expressly recognizes a hypothetical and contingent possibility."  Defs.' Mem. at 33.  However, the language cited by defendants does not give the

agency discretion to revise its recovery plan without

consideration of the procedural requirements set forth in

§ 1533(f)(4); rather, it imposes on the agency an additional

requirement that the recovery plan criteria reflect certain

goals, *i.e.*, that the criteria enable the eventual delisting of

the species.  As this District has already held, "the word

'would' . . . is used in the conclusion of a conditional

sentence to express a contingency or possibility.  Therefore,

'would result in a determination . . . that the species be

removed from the list' sets a target to be aimed at by meeting

the recovery goals set forth in the Plan."  *Fund for Animals v.

Babbit*, 903 F. Supp. 96, 103 (D.D.C. 1995)(internal citations

omitted).

      **B.**    **Whether the Agency Complied with the ESA by
Considering the "Intent" of the Recovery Plan Criteria**

In the Delisting Rule, the agency conceded that neither the

first criterion, "stable or expanding populations (based on

biennial sampling over a ten-year period) in a minimum of 80% of

the Geographic Recovery Areas," nor the third criterion, "the

management of the Geographic Recovery Areas in perpetuity," were

actually met at the time of delisting.  However, the agency

takes the position that the consideration of other data met the

"intent" of these two criteria such that the agency's actions

did not constitute a revision to the recovery plan.  Defs.' Mem.

at 14-15; AR at 37 (Delisting Rule states that "it is not practicable or necessary to measure actual [Squirrel] population numbers.").

The agency argues that the intent of the first criterion was met because the data collected showed a "robust population." Defs.' Mem. at 15; AR at 39.  In particular, defendants cite the fact that, whereas in 1981 only one individual Squirrel at one individual survey site had been identified, by 2006 the number of survey sites had risen to 109 and the number of captured Squirrels to 1,198.  Defs.' Mem. at 14-15; AR at 37-39.

Similarly, the defendants argue that the agency properly concluded that the intent of the third criterion had been met because "the present circumstances are significantly improved," Defs.' Mem. at 15, and "the original goal of permanent habitat protection of a few small areas is no longer necessary."  AR at 41.  Essentially, at the time of the listing and at the time the recovery plan was written, both the number of individual Squirrels and the number of occupied sites were believed to be extremely limited.  According to the defendants, "[i]n such circumstances, prudency required permanent protection of those few remaining Squirrel individuals[.]"  Defs.' Mem. at 15. However, once the agency determined that the present circumstances were significantly improved, such protections were no longer needed.  In support of this position, defendants cite

four factors relating to the recovery of the Squirrel: (1) the Squirrel spans roughly 85% of its former range; (2) all five of the GRAs identified in the 1985 Listing Rule are sufficiently interconnected to permit migration; (3) all five of the original Geographical Recovery Areas are now "predominantly" in public ownership; and (4) nearly 80% of all potential Squirrel habitat is protected from logging through various measures. Defs.' Mem. at 15.

Finally, the defendants argue that it would be illogical to require the agency to meet the criteria of an outdated recovery plan. Regarding the Squirrel's Recovery Plan in particular, defendants assert that "[o]lder recovery plans, such as this, typically focused on demographic parameters (e.g., population numbers, trends, and distribution), which are valid and useful sources of information, but alone do not determine a species' status." Defs.' Mem. at 6.

The court is not persuaded that the agency's decision to meet only the "intent" of its Recovery Plan criteria for the Squirrel complied with the ESA. The statute unambiguously requires that criteria must be "objective" and "measurable." 16 U.S.C. § 1533(f)(1)(B)(ii). Here, no one contests that the original criteria were objective and measurable when they were adopted as part of the Recovery Plan. The first criterion, for example, called for the agency to downlist or delist only when

it could be documented that "squirrel populations are stable or expanding (based on biennial sampling over a 10-year period) in a minimum of 80% of all Geographic Recovery Areas designated for the subspecies." AR at 15092. Instead of applying this Recovery Plan criterion, however, the agency now takes the position that the intent of this criterion can be met with persistence data rather than population data because, according to the agency, the "intent of this recovery criterion was to document that populations are robust." AR at 37. Using "robust population" as a criterion does not satisfy the statutory requirement that the recovery plan criteria be "measurable" and "objective".

At the very least, the alteration of the first and third criteria in this manner is a revision to the recovery plan that ought to have been subjected to public notice and comment, as required by § 1533(f)(4). Defendants' attempts to persuade the Court that subjecting a revised recovery plan to notice-and-comment rulemaking would be "illogical" and a "make-work exercise" ignore Congress' explicit instruction that the public be given an opportunity to comment on revisions to recovery plans. The statutory language is plain, and the Court therefore "must give effect to the unambiguously expressed intent of Congress." *Nat'l Cement Co. of California*, 494 F.3d at 1073.

**IV. REMEDY**

The Court concludes that vacating the Delisting Rule is the appropriate course of action in light of the agency's failure to comply with Section 4(f) of the ESA.[17]  In deciding whether to vacate an agency's rule, this Circuit has focused on two factors, namely the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Int'l Union, United Mine Workers*

---

[17] The Court finds sufficient basis to remand to the agency on this ground alone; therefore, other arguments advanced by plaintiffs are not addressed.  However, the Court does note that the agency appears to have taken the position that Factor D, requiring the agency to consider the "inadequacy of existing regulatory mechanisms," need not be separately analyzed if no threats are identified under Factors A, B, C or E.  In particular, the agency stated in its Delisting Rule that "[c]urrently, all threats under Factors A-C, and E have been eliminated or abated, and no regulatory mechanisms are needed to delist the [Squirrel].  Therefore, the inadequacy of regulatory mechanisms is not considered a threat to the subspecies."  AR at 19.  As plaintiffs correctly state, and defendants themselves seem to acknowledge, the ESA mandates that a species be listed as endangered or threatened i*f any one of the five factors* contained in § 1533(a)(1) is implicated. 16 U.S.C. § 1533(a)(1); AR at 13 ("Species are listed or delisted under the Act based on whether they are threatened or endangered by one or more Factors[.]"); see also *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008).  Accordingly, to the extent the agency's decision was based on an analysis that did not separately assess the adequacy of existing regulatory mechanisms, the agency is directed to do so on remand.

*of Am. v. Federal Mine Safety & Health Admin.,* 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Milk Train v. Veneman*, 310 F.3d 747, 755-756 (D.C. Cir. 2002).

Here, FWS failed to comply with unambiguous provisions of the ESA, and the Court is not inclined to speculate what the consequence of a properly revised recovery plan will be on the status of this species.   Furthermore, as this Court previously held in *Humane Society v. Kempthorne* 579 F. Supp. 2d 7, 21 (D.D.C. 2008) "the ESA's preference for protecting endangered species counsels strongly in favor of vacating the [Delisting] Rule while FWS revisits its statutory interpretation." *Id.* (citing *NRDC v. U.S. Dep't of the Interior*, 275 F. Supp. 2d 1136, 1145 (C.D. Cal. 2002)).   The Court therefore will vacate the Delisting Rule and remand it to the agency for further proceedings.

**V.   CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment is hereby **GRANTED**, and defendants' cross-motion for summary judgment is **DENIED**.   The Delisting Rule is **VACATED,** and this matter is **REMANDED** to the Fish and Wildlife Service for further proceedings consistent with the Court's ruling.   An appropriate Order accompanies this Memorandum Opinion.

**SIGNED:**     **Emmet G. Sullivan**
          **United States District Court Judge**
          **March 25, 2011**